**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**WESTERN DIVISION**

**RONALD HUSBAND** — **PLAINTIFF**

**VS.** — **CIVIL ACTION NO. 5:09cv118-MTP**

**CORRECTIONS CORPORATION OF AMERICA** — **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

This matter is before the court on Defendant's Motion for Summary Judgment [32]. Having reviewed the submissions of the parties, the entire record in this case and the applicable law, for the reasons set forth below the court finds that the motion should be granted and that Plaintiff's claims should be dismissed with prejudice.[1]

### Factual Background

On July 23, 2009, Plaintiff, proceeding *pro se* and *in forma pauperis*, filed the instant lawsuit pursuant to 42 U.S.C. § 1983. As clarified by his sworn testimony at an omnibus hearing held on April 27, 2010 pursuant to *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985),[2] Plaintiff asserts a claim of denial and/or delay medical treatment against Defendant Corrections Corporation of America (CCA), the private entity responsible for operating the Wilkinson County Correctional Facility in Woodville, Mississippi (WCCF), where Plaintiff was

---

[1] The parties having consented to disposition by the Magistrate Judge and the District Judge having entered an Order of Reference [25], the undersigned is authorized to enter final judgment pursuant to 28 U.S.C. § 636 (c)(1), Fed. R. Civ. P. 73 and Local Rule 73.1.

[2] *See Hurns v. Parker*, 1998 WL 870696, at *1 (5th Cir. Dec. 2, 1998); *Riley v. Collins*, 828 F.2d 306, 307 (5th Cir. 1987) (stating that plaintiff's claims and allegations made at *Spears* hearing supersede claims alleged in complaint).

incarcerated on a felony conviction when the claims in this action arose.[3]

Specifically, Plaintiff complains that it took six months for him to receive new dentures after his dentures broke.[4] He claims that in May 2009, he bit down on something and his dentures broke. Three days later, he saw a dentist at WCCF who tried to fix the broken dentures. However, Plaintiff claims the dentist told him that he did not have the proper supplies. Plaintiff claims that the dentist measured him for new dentures at that time, but that he did not receive the new dentures until November 23, 2009. While waiting for the new dentures, Plaintiff claims that his dentures broke again and he swallowed pieces of the broken dentures and cut his gums and tongue. Plaintiff also claims that he had trouble chewing his food and had to put water on his food in order to moisten it. He claims he could not eat and as a result, he lost between fifteen and twenty pounds. Plaintiff avers that the dentist told him that the reason for the delay in getting the new dentures was because "CCA was slow about paying funds."

Summary Judgment Standard

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is proper "where a party fails to establish the existence of an element essential to his case and on which he bears the burden of proof." *Washington v. Armstrong World Indus.*, 839 F.2d 1121, 1122 (5th Cir. 1988). "A complete failure of proof on an essential element renders all other facts immaterial because there is no

[3] Plaintiff is currently incarcerated at South Mississippi Correctional Institution (SMCI) in Leakesville, Mississippi.

[4] Plaintiff wore dentures prior to his entry into the prison system.

longer a genuine issue of material fact." *Id.*

This court may grant summary judgment only if, viewing the facts in a light most favorable to the plaintiff, the defendant demonstrates that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *Woods v. Smith,* 60 F.3d 1161, 1164 (5th Cir. 1995). If the defendant fails to discharge the burden of showing the absence of a genuine issue concerning any material fact, summary judgment must be denied. *John v. State of Louisiana,* 757 F.2d 698, 708 (5th Cir. 1985). The existence of an issue of material fact is a question of law that this court must decide, and in making that decision, it must "draw inferences most favorable to the party opposing the motion, and take care that no party will be improperly deprived of a trial of disputed factual issues." *Id.* at 712 (quoting *U.S. Steel Corp. v. Darby*, 516 F.2d 961, 963 (5th Cir. 1975)).

There must, however, be adequate proof in the record showing a real controversy regarding material facts. "Conclusory allegations," *Lujan v. National Wildlife Federation*, 497 U.S. 871, 902 (1990), unsubstantiated assertions, *Hopper v. Frank*, 16 F.3d 92, 96-97 (5th Cir. 1994), or the presence of a "scintilla of evidence," *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994), is not enough to create a real controversy regarding material facts. In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

In opposing summary judgment, "[i]t is not enough for [Plaintiff] to rest on mere conclusory allegations or denials in his pleadings...[Plaintiff] must point out, with factual specificity, evidence demonstrating the existence of a genuine issue of material fact on every component of his case." *Park v. Stocksill Boat Rentals, Inc.*, 492 F.3d 600, 605 (5th Cir. 2007) (citations omitted); *see also Paul Kadair, Inc.* v. *Sony Corp.,* 694 F.2d 1017, 1030 (5th Cir.

1983) ((“a plaintiff cannot defeat a motion for summary judgment by merely restating conclusory allegations contained in his complaint....”).

<u>Analysis</u>

Defendants contend that Plaintiff has failed to exhaust his administrative remedies and, therefore, his claims should be dismissed.

The Prison Litigation Reform Act (“PLRA”), 42 U.S.C. § 1997e(a), requires prisoners to exhaust available administrative remedies prior to filing suit under 42 U.S.C. § 1983. “[*P*]*roper* exhaustion of administrative remedies is necessary,” meaning that a prisoner cannot satisfy the exhaustion requirement “by filing an untimely or otherwise procedurally defective administrative grievance or appeal.” *Woodford v. Ngo*, 126 S.Ct. 2378, 2382 (2006) (emphasis added); *see also Johnson v. Ford*, 2008 WL 118365, at * 2 (5th Cir. Jan. 14, 2008) (stating that the Fifth Circuit takes “a strict approach” to the PLRA’s exhaustion requirement) (citing *Days v. Johnson*, 322 F.3d 863, 866 (5th Cir. 2003)); *Lane v. Harris Cty. Med. Dep’t*, 2008 WL 116333, at * 1 (5th Cir. Jan. 11, 2008) (under the PLRA, “the prisoner must not only pursue all available avenues of relief; he must also comply with all administrative deadlines and procedural rules.”) (citation omitted). “Indeed . . . a prisoner must now exhaust administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.” *Woodford*, 548 U.S. at 85.

“[I]t is not for the courts to inquire whether administrative procedures ‘satisfy minimum acceptable standards of fairness and effectiveness.’” *Alexander v. Tippah Cty.*, 351 F.3d 626, 630 (5th Cir. 2003) (*per curiam*), *cert. denied*, 541 U.S. 1012 (2004) (citing *Booth v. Churner*, 532 U.S. 731, 740 n.5 (2001)). Rather, prisoners simply “must exhaust such administrative remedies as are ‘available,’ whatever they may be.” *Id.* (citing *Wright v. Hollingsworth*, 260 F.3d 357, 358

(5th Cir. 2001)). Dismissal is appropriate where a prisoner has failed to exhaust all available administrative remedies. *See id.* (citing *Wright*, 260 F.3d at 359). Further, substantial compliance with administrative procedures is insufficient to permit pursuit of a federal lawsuit. Unless the prisoner pursues his "grievance remedy to conclusion," he has not exhausted "available remedies." *Wright*, 260 F.3d at 358.

Miss. Code Ann. § 47-5-801 grants the Mississippi Department of Corrections (MDOC) the authority to adopt an administrative review procedure at each of its correctional facilities. Pursuant to this authority, the MDOC has set up an Administrative Remedy Program (ARP) "through which an offender may seek formal review of a complaint relating to any aspect of their incarceration." *MDOC Inmate Handbook* (*available at* http://www.mdoc.state.ms.us/Inmate_Handbook/CHAPTER%20VIII.pdf), ch. VIII, ¶ 3. The ARP is a three step process. Inmates initially submit their grievance to the division head or adjudicator in writing, within thirty days after an incident has occurred. If, after screening, a grievance is accepted into the ARP, the request is forwarded to the appropriate official, who will issue a First Step Response. If the inmate is unsatisfied with this response, he may appeal to the Superintendent or Warden of the institution, who will then issue a Second Step Response. If still aggrieved, the inmate may appeal to the Commissioner of MDOC, where a Third Step Response is issued. At this time, the Administrator of the ARP will issue the inmate a certificate stating that he has completed the exhaustion of his administrative remedies and can now proceed to court. *See MDOC Inmate Handbook*, ch. VIII; *see also Cannady v. Epps*, 2006 WL 1676141, at * 1 (S.D. Miss. June 15, 2006).

According to the sworn affidavit of Janice Fountain, Grievance Officer at WCCF (Exh. B to MSJ), Plaintiff has only completed the first step of the ARP with respect to the claims asserted

in this lawsuit. *See* Fountain Aff. ¶ 4. The record reflects that on or about September 14, 2009, Plaintiff sent a letter request for administrative remedy to Emmitt Sparkman, MDOC Deputy Commissioner, which was forwarded to WCCF's grievance department. The grievance was then sent to the Legal Claims Adjudicator at the Mississippi State Penitentiary in Parchman, Mississippi, pursuant to MDOC policy. After it was reviewed by the Legal Claims Adjudicator, the grievance was sent back to WCCF and investigated by Mitchell David Thomas, Health Services Administrator at WCCF. *See* Fountain Aff. ¶ 5; Exhs. B & D to Fountain Aff. On November 30, 2009, Plaintiff received a First Step Response Form from Mr. Thomas stating that his dentures had been repaired numerous times and that a new set had been ordered. Plaintiff was notified that if he desired, he could proceed with the second step of the ARP process. *See* Fountain Aff. ¶ 5; Exh. C to Fountain Aff. According to Ms. Fountain, Plaintiff never proceeded any further in the ARP process. *See* Fountain Aff. ¶ 5. However, in response to defendant's motion, Plaintiff has submitted what purports to be a handwritten copy of his second step of the ARP, dated November 21, 009. *See* [36-2]. Plaintiff avers that he "never heard from or receive a response thereof as a result of a failed A.R.P. system utilized and maintained by W.C.C.F./C.C.A." *See* Response [36] at 3.

Even assuming *arguendo* that Plaintiff did submit a second step request but never received a response, this would not excuse his failure to exhaust. "The failure of prison officials to respond to a grievance does not constitute a valid excuse for failure to exhaust administrative remedies." *Johnson v. Cheney*, 2008 WL 534606, at * 3 (N.D. Tex. Feb. 8, 2008) (citations omitted), *Report and Recommendation adopted*, 2008 WL 541762 (N.D. Tex. Feb. 27, 2008), *aff'd*, 313 Fed. Appx. 732 (5th Cir. Mar. 11, 2009); *see also Curry v. Alexandre*, 2006 WL 2547062, at * 3 (W.D. La. June 19, 2006) (citing *Wright*, 260 F.3d at 358) ("a plaintiff cannot be

excused from the PLRA's mandatory exhaustion requirements based on allegations that his grievance(s) was ignored."). Indeed, the ARP allows an inmate to proceed to the next level when he fails to receive a response in the time frames provided for in the program. *See MDOC Inmate Handbook*, Chapter VIII at ¶ IX ("... expiration of response time limits without receipt of a written response shall entitle the offender to move on to the next step in the process").

As stated by the United States Supreme Court:

> The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules. A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction . . . .

*Woodford*, 548 U.S. at 95. Because Plaintiff did not properly follow the MDOC's administrative grievance procedures with regard to either of the claims asserted herein, he has failed to exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a). *See id.*; *see also Johnson*, 313 Fed. Appx. at 733 ("Johnson's failure to pursue his grievance remedy to conclusion constitutes a failure to exhaust his administrative remedies.") (citation omitted); *Lane*, 2008 WL 116333, at *1 (affirming dismissal of prisoner complaint for failure to exhaust administrative remedies by failing to complete administrative review process); *Wright*, 260 F.3d at 358 (dismissing prisoner suit for failure to exhaust where prisoner only filed a step-one grievance but "did not pursue the grievance remedy to conclusion.").

Because Plaintiff has failed to exhaust his administrative remedies, this case may be dismissed without prejudice. However, since Plaintiff's claims lack merit, as discussed below, the court finds that they should instead be dismissed with prejudice.

"Prison officials violate the constitutional proscription against cruel and unusual

punishment when they are deliberately indifferent to a prisoner's serious medical needs, as doing so constitutes unnecessary and wanton infliction of pain." *Davidson v. Texas Dep't of Criminal Justice*, 91 Fed. Appx. 963, 964 (5th Cir. Mar. 19, 2004), *cert. denied*, 543 U.S. 864 (2004), (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). The Fifth Circuit has noted that deliberate indifference "is an extremely high standard to meet." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quoting *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)). The test for establishing deliberate indifference is "one of subjective recklessness as used in the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official may not be held liable under this standard pursuant to Section 1983 unless the Plaintiff alleges facts which, if true, would establish that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Id.* at 838.

To successfully make out a showing of deliberate indifference, a plaintiff must "submit evidence that prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any other similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Davidson*, 91 Fed. Appx. at 965 (quoting *Domino*, 239 F.3d at 756). "Unsuccessful medical treatment, ordinary acts of negligence, or medical malpractice do not constitute a cause of action under § 1983." *Id.* (citing *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999)). The plaintiff is not entitled to the "best" medical treatment available. *McMahon v. Beard*, 583 F.2d 172, 174 (5th Cir. 1978); *Irby v. Cole*, 2006 WL 2827551, at *7 (S.D. Miss. Sept. 25, 2006). A prisoner's mere "disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs." *Norton*

*v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 2001). Further, "[d]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference [that] *results in substantial harm*." *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (emphasis added) (citation omitted).

In support of its motion, Defendant has submitted an affidavit from Lee Casey, DMD, a dentist at WCCF who treated Plaintiff for his dental complaints during 2009. Dr. Casey avers that on February 25, 2009, Plaintiff first came to the medical clinic complaining that his dentures were broken. Dr. Casey recommended that new dentures be ordered, but Plaintiff wanted his dentures to be repaired instead. Accordingly, Dr. Casey took an impression of the dentures, repaired them and returned them to Plaintiff either that same day or the next day. *See* Casey Aff. ¶ 4; *see also* Exh. 2 to Casey Aff. Plaintiff submitted another medical services request form on April 24, 2009 stating that his dentures had broken again, and complained that they were cutting his gums. He was seen by Dr. Casey on April 27, 2009. Dr. Casey took another impression, repaired the dentures, and returned them to Plaintiff the following day.

On June 29, 2009, Plaintiff returned again to the clinic complaining that his dentures were broken. Upon examination of the dentures, Dr. Casey noted that they were broken in a different place than before. Dr. Casey recommended that Plaintiff either get new dentures, or that the dentures be repaired by an outside laboratory,[5] but Plaintiff refused, explaining that he wanted to get the dentures back quickly. Dr. Casey repaired the dentures and also took an impression so that an outside laboratory could make a new set of dentures for Plaintiff. Dr. Casey sent the impression to Allen Dental Lab on June 29, 2009 and requested that they make "wax rims for

[5] Dr. Casey avers that although an outside repair lab would have taken longer, the repair work "likely would have been superior to what we could do on-site" because an outside lab could employ "different methods." *See* Casey Aff. ¶¶ 18, 22.

upper/lower complete dentures." *See* Casey Aff. ¶¶ 4-6; *see also* Exhs. 1, 2, 4 & 12 to Casey Aff.

The following day, on June 30, 2009, Plaintiff returned to the clinic and again complained that his dentures were broken. Dr. Casey repaired them again. At this point, Dr. Casey began to suspect that the repeated fractures of Plaintiff's dentures were not accidental, and that Plaintiff "was doing something out of the ordinary that was causing his dentures to break."[6] This suspicion was based on the fact that Dr. Casey saw no reason why the dentures should repeatedly break after being repaired, as well as the fact that each time Plaintiff came to the clinic, he requested a "lay-in" tray so that he could eat his meals at his own pace in his cell, rather than in the dining hall. Plaintiff explained to Dr. Casey that it was taking him longer to eat his meals so he needed to eat them in his cell to ensure that he had sufficient time to eat. Dr. Casey granted such a request on June 30, 2009, allowing Plaintiff a 48-hour lay-in tray. *See* Casey Aff. ¶ ¶ 7 & 9; *see also* Exhs. 2 & 8 to Casey Aff.

Plaintiff received his repaired dentures on July 1, 2009. The next day, he returned to the clinic and complained that his dentures had broken again after only one hour in the cafeteria. Again, Dr. Casey repaired them and instructed Plaintiff to be more careful. Dr. Casey again suggested that the dentures be repaired by an outside laboratory, which could employ a stronger repair method, but Plaintiff refused. On July 7, 2009, Plaintiff returned to the clinic complaining

[6] Plaintiff denies doing anything to cause his dentures to break. *See* Response [36] at 2-3. He argues that this would not have been in his best interest, because he knew that Dr. Casey would simply order a new set of dentures, which he did not want. Plaintiff explains that "any person...whom [sic] wears denture's [sic] that are comfortable would be slow to have a new set made because of the lengthy time frame and because of complication [sic] that arise with new denture [sic]." Specifically, Plaintiff contends that "ill-fitting dentures often cause's [sic] sore's [sic] on the mouth often giving great discomfort and loss of sleep and reducing one's appetite and/or causing embarrassment while eating and no possible way to get a denture adjustment on the weekend or after hours." *See* Response at 2.

that his dentures had broken again. Dr. Casey noted that he had repaired the dentures on three occasions using "Jet Denture Repair Acrylic," but that this had not been adequate. Thus, Dr. Casey again suggested to Plaintiff that his dentures be repaired by an outside laboratory, and he told him that without such repair they would continue to break, but Plaintiff refused, explaining that he "can't eat without them and [sic] painful." Dr. Casey told Plaintiff that he should not wear the broken dentures while waiting for the new dentures to arrive.[7] Dr. Casey granted Plaintiff another lay-in tray for seven days so that he could take his meals to his pod. *See* Casey Aff. ¶¶ 8-10; *see also* Exhs. 2, 3 & 10 to Casey Aff.

On July 16, 2009, Plaintiff submitted a medical services request form requesting that he receive an extension on his lay-in tray until his new dentures arrived. In response, Plaintiff was informed that Dr. Casey was out until the following week so he could not grant the request, and he was told to check with his Unit Manager or Correctional Counselor to see if there was anything they could do. Plaintiff returned to the clinic on July 30, 2009 complaining that he was experiencing pain while eating. Dr. Casey informed Plaintiff that the wax rims would be arriving from Allen Dental Lab in a week, and at that time another step would have to be taken before they were ready. The wax rims were received on August 6, 2009. Plaintiff was seen that day at the clinic for measurements, and the wax rims were sent back to Allen Dental Lab. In an effort to expedite the process, Dr. Casey requested that the lab rush the fabrication, and he decided to

[7] Dr. Casey noted at this time that the new dentures were in the process of being fabricated, and it would take three more visits to complete. *See* Casey Aff. ¶ 10; *see also* Exh. 3 to Casey Aff. According to Dr. Casey, "[i]t is common for patients that wear dentures to eat without their dentures in. Typically, the gums of a person that has worn dentures for a period of time have hardened and there is no pain in eating ordinary foods. In other words, the patient should have been able to consume the meals provided to him at WCCF without his dentures in." *See* Casey Aff. ¶ 18.

skip one of the optional steps in the fabrication process.[8] Plaintiff was again told by Dr. Casey that his dentures should be repaired by an outside laboratory, but Plaintiff again refused. *See* Casey Aff. ¶¶ 11-14; *see also* Exhs. 3, 6 & 13 to Casey Aff.

Plaintiff received another lay-in tray for 30 days from Dr. Casey on August 6, 2009. On September 2, 2009, Plaintiff submitted a medical services request form requesting "to review status of visits & follow-ups for time extent confirmation." Dr. Casey responded by documenting the repair work and consultations that had been performed to date. *See* Casey Aff. ¶¶ 16-17; *see also* Exhs. 7 & 11 to Casey Aff. On September 3, 2009, Plaintiff returned to the clinic complaining that he had swallowed part of his broken dentures. Dr. Casey reminded Plaintiff that he had been told not to wear the broken dentures, and he granted Plaintiff another lay-in tray for three weeks. On September 29, 2009, Dr. Casey granted Plaintiff a "therapeutic diet request" for one month so that his food could be "mechanically manipulated to meet [his] limited chewing abilities." *See* Casey Aff. ¶¶ 18-20; *see also* Exhs. 3, 5 & 9 to Casey Aff.

Plaintiff's new dentures were received from Allen Dental Lab on November 23, 2009, and Plaintiff received them that day. Dr. Casey explains that although the process of fabricating the new dentures took several months, this is "not an uncommon length of time to wait for dentures to be made." Dr. Casey avers that some laboratories might have been able too complete the process in two to three months, but Dr. Casey "had confidence in the work at Allen Dental Lab," and he avers that "the long wait time was simply due to the volume the laboratory was experiencing at the time." Dr. Casey avers that the delay in receiving the dentures had nothing to do with CCA, WCCF or any of their employees, nor did it have anything to do with costs

[8] This optional step is to have a wax "try-in" created for the patient to test out and in order to decide whether it is aesthetically pleasing. *See* Casey Aff. ¶ 15.

associated with the work. Dr. Casey avers that he was never denied resources to treat Plaintiff, nor did he ever indicate to Plaintiff that such was the case. *See* Casey Aff. ¶¶ 21 & 24; *see also* Exhs. 3 & 14 to Casey Aff.

Thus, the record clearly reflects that Plaintiff's requests for treatment were neither "ignored" nor "refused." *See Davidson*, 91 Fed. Appx. at 965 (citation omitted). To the contrary, Plaintiff received repeated treatment by Dr. Casey for his broken dentures (on approximately ten separate occasions), and ultimately did receive new dentures. In addition, Dr. Casey provided Plaintiff with lay-in trays on numerous occasions so that he could eat his food slowly in his cell, and at one point Dr. Casey prescribed him a therapeutic diet so that he could have softer food while waiting for his new dentures to arrive. *See*, *e.g.*, *Norton v. Schmidt*, 132 F.3d 1455 (5th Cir. 1997) (no deliberate indifference where prisoner requesting dentures was seen and treated by medical and dental staff on fifteen occasions in one year and "adjustments were made to accommodate [plaintiff's] condition": "At most, the prison staff was negligent in failing to provide dentures" and attempting instead "to care for [plaintiff] through other means and treatments.")).

Nor does the record reflect that Plaintiff was "intentionally treated...incorrectly." *See Davidson*, 91 Fed. Appx. at 965 (citation omitted). Rather, Dr. Casey attempted to repair Plaintiff's dentures each time they broke, but was not able to permanently fix them because the repair material available at WCCF was not adequate for Plaintiff's needs.[9] As noted *supra*, "[u]nsuccessful medical treatment" or "ordinary acts of negligence" do not constitute a cause of action under § 1983." *Davidson*, 91 Fed. Appx. at 965 (citation omitted). Plaintiff claims that

---

[9] Indeed, as noted *supra*, Dr. Casey recommended to Plaintiff several times that his dentures be sent to an outside laboratory for repair, because the repair work would have been better than what he was able to do at WCCF, but Plaintiff refused.

every time Dr. Casey repaired his dentures, Dr. Casey told him that "C.C.A. refused to supply his department with the proper and adequate material to make better longer lasting repair which would substantially hold and function until a new set of dentures could be completed." *See* Response [36] at 2. Dr. Casey avers that he was never denied resources to treat Plaintiff, nor did he ever indicate to Plaintiff that such was the case. *See* Casey Aff. ¶¶ 22, 24. At any rate, even if this were true, Plaintiff still cannot establish deliberate indifference, as he is not entitled to the "best" medical treatment available. *See McMahon*, 583 F.2d at 174; *Irby*, 2006 WL 2827551, at *7.

Dr. Casey did ultimately obtain a new set of dentures for Plaintiff. Although there may have been some delay in receiving the dentures, Dr. Casey avers that this was not caused in any way by CCA, but was because the outside laboratory was experiencing a high volume of work. He further states that the delay experienced by Plaintiff was not "grossly outside of the ordinary time that such a procedure should take." *See* Casey Aff. ¶¶ 21, 24.

Further, Plaintiff has failed to establish that the delay in receiving his new dentures caused him substantial harm. While Plaintiff claims he lost between fifteen and twenty pounds as result of having to eat either with broken dentures or without any dentures at all and received cuts on his gums, there is no evidence in the record to support these allegations. *See*, *e.g.* *Foxworth v. Khoshdel*, 2009 WL 3255270, at * 7 (S.D. Tex. Sept. 28, 2009) (concluding that plaintiff failed to establish deliberate indifference because "[a]lthough [he] asserts in his complaint that chewing prison food without teeth or dentures causes cuts and other damage to his gums and mouth, the competent summary judgment evidence fails to reveal objective medical findings verifying such damage."). Accordingly, as Plaintiff has failed to establish that he suffered substantial harm as a result of the delay in receiving his dentures, for this reason as well

Plaintiff's claim should be dismissed. *See*, *e.g.*, *Greenlaw v. Hill*, 2007 WL 1876515, at *3 (D. Or. Jun. 27, 2007) (holding that 16- month delay in receiving dentures did not constitute an Eighth Amendment violation where Plaintiff did not present evidence that the delay caused him any physical harm); *Whitely v. Russo*, 2006 WL 2434445, at *4 (S.D. Tex. Aug. 21, 2006) (holding that plaintiff failed to show defendants were deliberately indifferent to his serious medical needs, reasoning in part that "Plaintiff has failed to show he suffered any illness or harm, beyond discomfort, because he did not have dentures.").

Finally, it is well-settled that Section 1983 does not "create supervisory or *respondeat superior* liability." *Oliver v. Scott,* 276 F.3d 736, 742 & n.6 (5th Cir. 2002); *see also Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987) (citations omitted). Like municipal corporations, a private prison-management corporation such as CCA[10] is not vicariously liable under a theory of *respondeat superior* for constitutional violations of its employees. *See Olivas v. CCA*, 215 Fed. Appx. 332, 333 (5th Cir. Jan. 30, 2007) (*per curiam*) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)); *Turks v. Wilkinson*, 2010 WL 1740798, at * 3 (W.D. La. Apr. 8, 2010), *Report and Recommendation adopted*, 2010 WL 1740789 (W.D. La. Apr. 29, 2010) (citing *Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 469, 461 (5th Cir. 2003)); *see also Lonoaea v. CCA*, 665 F.Supp. 2d 677, 685 (N.D. Miss. 2009) (citations omitted). Thus, CCA can be held liable under § 1983 only where "an official policy or custom...causes or is the moving force of the constitutional violation."[11] *Turks*, 2010 WL 1740798, at * 3 (citing *Phillips v. CCA*, 2006

---

[10] The Fifth Circuit has held that "private prison management companies and their employees may be sued under § 1983 by a prisoner who has suffered a constitutional injury...because confinement of wrongdoers...is a fundamentally governmental function." *Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 459, 461 (5th Cir. 2003).

[11] This test is essentially the same as the one employed for municipal or local governmental liability. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978).

WL 1308142, at * 3 (W.D. La. May 01, 2006); *Monell*, 436 U.S. at 694.

Plaintiff has failed to establish that there was any official policy or custom that was the moving force of the alleged constitutional violation. Moreover, as discussed *supra*, Plaintiff was treated for his dental problems, and his disagreement with the medical treatment he received does not amount to a constitutional violation. *See Norton*, 122 F.3d at 292; *see also McMahon*, 583 F.2d at 174 (holding that prisoners are not entitled to the "best" medical treatment available). While Plaintiff disagrees with the treatment received and the length of the time it took to receive new dentures, the record is clear that Defendant was in no way deliberately indifferent to his needs. Plaintiff was seen, treated and monitored many times by a dentist throughout the period in question.

IT IS , THEREFORE, ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment [32] is granted and Plaintiff's claims are dismissed with prejudice. A separate judgment will be entered pursuant to Fed. R. Civ. P. 58.

SO ORDERED AND ADJUDGED on this the 15th day of September, 2010.

s/ Michael T. Parker
United States Magistrate Judge